```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
ENRON POWER MARKETING, INC.,        :
                                    :
                Plaintiff,          :
                                    :   05 Civ. 9244 (LAP)
        -against-                   :
                                    :
LUZENAC AMERICA, INC.,              :
                                    :
                Defendant.          :
-----------------------------------x
ENRON POWER MARKETING INC.,         :
                                    :
                Plaintiff,          :
                                    :   05 Civ. 10129 (LAP)
        -against-                   :
                                    :   OPINION AND ORDER
PUBLIC UTILITY DISTRICT NO. 1       :
OF SNOHOMISH COUNTY,                :
                                    :
                Defendant.          :
-----------------------------------x
```

LORETTA A. PRESKA, United States District Judge:

Plaintiff Enron Power Marketing, Inc. ("EPMI") brought adversary proceedings in its bankruptcy against Luzenac America, Inc. (05 Civ. 9244) and Public Utility District No. 1 of Snohomish County (05 Civ. 10129)[1] (collectively, "Defendants") to recover termination payments provided for in their respective long-term power supply contracts.  EPMI moves for a determination that the bankruptcy court--rather than the Federal

_____

[1] EPMI also had brought actions against Metropolitan Water District of Southern California (05 Civ. 10130), The City of Santa Clara (05 Civ. 10128), and Valley Electric Assoc., Inc. (05 Civ. 10127), but those actions settled and were withdrawn in July 2006.

Energy Regulatory Commission ("FERC")--can and should resolve the state-law termination-payment issues that relate to the state-law contract matters under § 1290 of the Energy Policy Act of 2005 (the "Cantwell Amendment") because, it argues, the Cantwell Amendment is merely a clarifying statute that affirms the traditional division of power between FERC and the courts.[2] Defendants cross-move to dismiss or stay the adversary proceedings.  Defendant Luzenac cross-moves to transfer the proceedings to FERC, and the Government, as intervenor, argues that the constitutionality of the "Cantwell Amendment" is not ripe for review.

<u>BACKGROUND</u>

During 2000-2001, EPMI had a long-term contract to deliver electric power to each Defendant.  The contracts contained a provision requiring a termination payment--a payment by the party "in the money" at the time of termination based on the difference between the contract price and market price for a replacement contract--in the event that either party terminated the contract prior to its full term.  During the contract terms, the Western United States underwent a power crisis that "was

---

[2] While EPMI originally requested that Defendants "be enjoined from pursuing at FERC the state law matters at issue in the adversary proceeding," EPMI Opening Brief at 42, dated January 31, 2006, EPMI stated at oral argument on July 26, 2006, that it was not requesting an injunction but simply a holding on the meaning of the Cantwell Amendment, Transcript of oral argument, 110:9-110:13.

subjected to artificial manipulation on a massive scale."
Lockyer v. FERC, 383 F.3d 1006, 1014 (9th Cir. 2004).  After
numerous Enron debtors, including EPMI, filed Chapter 11
bankruptcy petitions on December 2, 2001, Defendants terminated
their contracts with EPMI.  EPMI thereafter filed adversary
proceedings in the bankruptcy court to recover the termination
payments from those Defendants.  While those actions were in
mediation in the bankruptcy court, the parties made a number of
motions in the bankruptcy court and FERC in which the bankruptcy
judge held, inter alia, that the bankruptcy court maintained
jurisdiction over the state-law contract issues and FERC had
jurisdiction over issues of disgorgement of EPMI profits. See
Comet Decl.,[3] Ex. Y, bankruptcy court proceeding in a related
trading case involving Nevada Power Co. and Sierra Pacific Power
Co., No. 01-16034, at 16-21, 24-27 (Jan. 4, 2005).[4]

     The issue over the termination payments to Enron drew
political attention in the West.  On August 8, 2005, the
President signed into law the Energy Policy Act of 2005, which
included the Cantwell Amendment.  The Cantwell Amendment, named
for Senator Maria Cantwell of Washington State, provides:

_____

[3] "Comet Decl." refers to the Declaration of Howard B. Comet,
dated January 31, 2006.

[4] Appeals on two bankruptcy court orders are pending but stayed
before Judges Kaplan (05 Civ. 2588) and Casey (05 Civ. 2710) in
the Southern District of New York.

Sec. 1290. RELIEF FOR EXTRAORDINARY VIOLATIONS.

(a) Application.--This section applies to any contract entered into the Western Interconnection prior to June 20, 2001, with a seller of wholesale electricity that the Commission has--

> (1) found to have manipulated the electricity market resulting in unjust and unreasonable rates; and

> (2) revoked the seller's authority to sell any electricity at market-based rates.

(b) Relief.--Notwithstanding section 222 of the Federal Power Act (as added by section 1262), any provision of title 11, United States Code, or any other provision of law, in the case of a contract described in subsection (a), the Commission shall have exclusive jurisdiction under the Federal Power Act (16 U.S.C. 791a et seq.) to determine whether a requirement to make termination payments for power not delivered by the seller, or any successor in interest of the seller, is not permitted under a rate schedule (or contract under such a schedule) or is otherwise unlawful on the grounds that the contract is unjust and unreasonable or contrary to the public interest.

(c) Applicability.--This section applies to any proceeding pending on the date of enactment of this section involving a seller described in subsection (a) in which there is not a final, nonappealable order by the Commission or any other jurisdiction determining the respective rights of the seller.

119 Stat. at 983-84.

After the Cantwell Amendment passed, the Defendants filed petitions to have FERC resolve the termination-payment claims. Snohomish argued that it was fraudulently induced into entering contracts with Enron and that Enron could not collect termination payments under the Federal Power Act ("FPA") or

state law; Luzenac argued that Enron could not collect a termination payment under its revoked rate schedule and terminated tariff and that permitting Enron to collect a termination payment would be unjust and unreasonable or contrary to the public interest.  In response, EPMI 1) moved in this Court[5] to withdraw the reference to the bankruptcy court as to Luzenac to enable a court--not FERC--to construe the Cantwell Amendment and, if required, determine its constitutionality, and 2) moved in the bankruptcy court to enforce the automatic stay and mediation order and to enjoin Luzenac's proceeding before FERC.  By order dated November 2, 2005, the bankruptcy court denied EPMI's motion for injunctive relief, explaining that the Cantwell Amendment provides exclusive jurisdiction to FERC, including state-law disputes regarding termination payments.  See Rabinowitz Decl., Ex. 14, bankruptcy court proceeding, No. 01-16034, at 5-6.[6]  EPMI appealed the November 2 Order to this Court (05 Civ. 10438), which is now pending but stayed by consent and Order dated February 14, 2006.  On December 15, 2005, this Court granted, on consent, EPMI's motion to withdraw the reference with respect to issues relating to the Cantwell Amendment; the

---

[5] EPMI filed a similar motion regarding each Defendant in the succeeding weeks.

[6] "Rabinowitz Decl." refers to the Declaration of David Rabinowitz, dated March 17, 2006.

stipulation included Defendants' right to argue that FERC first should decide the Cantwell Amendment issues.

On June 28, 2006, FERC issued an Order in the EPMI-Snohomish matter in which FERC 1) determined that EPMI should not collect termination payments based on New York state contract law, finding there to have been fraud in the inducement, and 2) deferred any decision on the constitutionality of the Cantwell Amendment in the expectation that it would be decided by this Court. <u>Public Utility Dist. No. 1 of Snohomish County, Washington</u>, 115 FERC ¶ 61,375, No. EL05-139-000, 2006 WL 1757334 ¶¶ 83, 27.

<u>DISCUSSION</u>

A. <u>Cross-motions to Dismiss, Stay, or Transfer Proceedings</u>

I will first address the Defendants' cross-motions to dismiss, stay or transfer the proceedings, as a decision in Defendants' favor would obviate the need for a decision on EPMI's motion.  Similarly, I will next address the Government's argument that a decision on the constitutionality of the Cantwell Amendment is not ripe for review.  For the reasons discussed below, Defendants' motions are denied.

Defendants cross-move to stay or dismiss this action because (1) EPMI did not seek rehearing of FERC's conclusions on the Cantwell Amendment, which is a statutory prerequisite to judicial review, and thus failed to preserve its claims on the

scope and constitutionality of the Cantwell Amendment; (2) EPMI raised the same issue with FERC that it now raises with this Court and, thus, should appeal that action to the Court of Appeals rather than have two actions proceeding simultaneously before a district court and a Court of Appeals; (3) FERC appeals are properly before the appropriate Court of Appeals, as required by 16 USCS § 825*l*(b),[7] and not this Court; (4) exhaustion of remedies requires that FERC first rule on the matter;[8] (5) EPMI's constitutional challenge must first be heard by FERC to develop a record for review to determine if a further

---

[7] 16 USCS § 825*l*(b) provides that:

> (b) Judicial review. Any party to a proceeding under this Act [16 USCS §§ 791a et seq.] aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the Circuit Court of Appeals of the United States for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. . . . The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification. . . .

[8] This argument is moot, as FERC has since ruled on the action in general and decided to defer the question of the constitutionality of the Cantwell Amendment to this Court.

ruling is necessary based on how FERC rules;[9] and (6) EPMI does not meet the requirements for injunctive relief.[10]

Here, as to Defendants' first argument, EPMI contends that this "would create the ultimate Catch-22" because FERC specifically deferred to the district court on the constitutionality issue, and now Defendants ask that this Court defer to FERC on the very issue FERC refused to decide. EPMI Response to the Government's Memorandum, dated July 21, 2006, at 2. Indeed, it would be fruitless to send this matter back to FERC to determine a matter that it already has decided that it will not determine. Further, an Article III court--not FERC-- should construe and, if necessary, decide the constitutionality of the Cantwell Amendment. Determining the constitutionality of legislation is not in the domain of an agency, and it is precisely the role of an Article III court.

As to the Defendants' second and third arguments, the Court of Appeals has held that it did not have jurisdiction to hear an appeal by an order of the Federal Power Commission ("FPC," the predecessor agency of FERC) when the FPC issued a ruling that was not "under" the FPA. Greene County Planning Bd. v. Federal Power Comm'n, 528 F.2d 38, 40 (2d Cir. 1975). Instead, the

---

[9] This argument is moot, as FERC has since decided the matter on a state-contract law basis, as it deemed appropriate under the Cantwell Amendment.

[10] This argument is moot, as EPMI confirmed at oral argument that it is not seeking an injunction. See supra note 2.

Court of Appeals explained, the district court would be the
appropriate court to which to appeal such a decision. Id. at 46.
Here, FERC exclusively applied New York state contract law in
its June 28 Order. See Snohomish County, 115 FERC ¶ 61,375, No.
EL05-139-000, 2006 WL 1757334.  By issuing a decision that did
not implicate the FPA, this particular FERC ruling might not be
subject to direct review by a Court of Appeals, as FERC's
decisions traditionally are.  Thus, jurisdiction might not lie
with a Court of Appeals.  Accordingly, I find that Defendants'
first three arguments for the cross-motion are without merit and
the last three are moot.

     Defendant Luzenac urges transfer of the action to FERC,
rather than a stay or dismissal, because a transfer would create
a more complete record with FERC having ruled on its own
jurisdiction under the Cantwell Amendment and all rulings would
then become appealable to an appropriate Court of Appeals.
Unlike a stay or dismissal, the appeal of a transfer order would
be interlocutory and non-final, thus precluding a conflicting
ruling from this Court.  I agree with EPMI, however, that there
is no authority that permits transfer of the sort that Luzenac
proposes; instead, the statute authorizes transfer from one
district to another with respect to venue "[f]or the convenience
of parties and witnesses, in the interest of justice." 28 U.S.C.
§ 1404.  That is not the situation here.  Transferring this

action from an Article III court to an Article I agency would be improper because, as Judge Richard Conway Casey explained earlier this year, "FERC does not have the authority to determine the Court's jurisdiction." In re Calpine Corp., 337 B.R. 27, 37 n.8 (S.D.N.Y. 2006).  Thus, I decline to transfer the proceeding to FERC.

Next, Defendants and the Government argue that the question of the constitutionality of the Cantwell Amendment is not ripe and that ruling on it would not be prudent, as the underlying actions are still in the bankruptcy court or could be appealed.[11] The Government argues that the question of the constitutionality of the Cantwell Amendment is not ripe or prudent for review because (1) the matter is not fit for decision because a factual record must still be developed, courts want to avoid inconsistent decisions and multiple proceedings, and a decision may be unnecessary, and (2) there is no hardship to EPMI in waiting for the actions to be final.  While the Government may be accurate in the traditional case where the clear "next step" would occur soon, this matter is sui generis.  Here, there is too much uncertainty.  The mandatory process of appealing the FERC action to the full commission, and then requesting a rehearing through FERC, and then seeking judicial review in the

_____

[11] Some matters also were with FERC on the Snohomish matter but appear to have been resolved since the original memoranda were filed.  Still, these also might be appealed.

appropriate Court of Appeals, see DiLaura v. Power Auth. of
N.Y., 982 F.2d 73, 79 (2d Cir. 1992), could take some time, and
it is in the best interest of the bankrupt entities and their
creditors that bankruptcy litigation be decided quickly, see,
e.g., Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995)
("'Congress intended to grant comprehensive jurisdiction to the
bankruptcy courts so that they might deal efficiently and
expeditiously with all matters connected with the bankruptcy
estate.'"); In re Soloway & Katz, 234 F. 67, 68-69 (2d Cir.
1916) ("A proceeding in bankruptcy is intended to get the assets
as speedily as possible into the hands of the creditors.").  As
to the fitness for review, there is no factual record for FERC
to develop further, as FERC did not hold an evidentiary hearing
but decided the matter on state-law contract grounds on the
record before it.  As to avoiding multiple proceedings, they
seem to be inherent in the statutory scheme.  As noted above,
FERC has ruled in the Snohomish matter, but the Luzenac matter
still is pending before the agency.  Because an appeal from FERC
may be taken either in the circuit where the licensee or public
utility to which the order relates is located or has its
principal place of business or to the Court of Appeals for the
District of Columbia Circuit, there might well be appeals from
FERC rulings on termination payments pending in two different
Courts of Appeals.  In addition, EPMI already has appealed to

this Court the bankruptcy court's November 2, 2005 Order ruling that FERC has exclusive jurisdiction over state-law contract claims for termination payments (05 Civ. 10438) and FERC's June 28, 2006 Order in the EPMI-Snohomish matter ruling that EPMI should not collect termination payments based on state contract law (06 Civ. 5542).

In sum, the unusual proliferation of proceedings here, the uncertainty of the timing and venue of the appeals from the June 28, 2006 FERC Order in the Snohomish matter and the yet-to-be-issued FERC order in the Luzenac matter, the clear jurisdiction in this Court to construe and decide the constitutionality of the Cantwell Amendment, and the public interest in prompt resolution of the affairs of bankrupt entities persuades me that a prompt ruling by this Court is the preferred course.

B. FERC Jurisdiction Under the Cantwell Amendment

Defendants and the Government read the Cantwell Amendment as granting FERC exclusive jurisdiction over all of the issues relating to termination payments, including the state-law contract claims for termination payments.  EPMI reads the Cantwell Amendment as granting exclusive jurisdiction to FERC only in matters of termination-payment disputes involving federal regulatory authority governed by the FPA, which, in effect, affirms the power that FERC already had under the FPA. If the Cantwell Amendment is read to give FERC exclusive

jurisdiction over more than the termination-payment disputes governed by the FPA, EPMI argues that this raises grave questions as to the constitutionality of the Cantwell Amendment. For the reasons discussed below, I agree with EPMI's reading of the Cantwell Amendment.

The Federal Regulation and Development of Power Act describes FERC's jurisdiction regarding rates as follows:

§ 205 of Federal Power Act (16 U.S.C. § 824d)

(a) Just and reasonable rates. All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful. . . .

§ 206 of Federal Power Act (16 U.S.C. § 824e)

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues. Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons

for any proposed change or changes therein. If, after
review of any motion or complaint and answer, the
Commission shall decide to hold a hearing, it shall
fix by order the time and place of such hearing and
shall specify the issues to be adjudicated.

(emphases added).

EPMI argues that under the Cantwell Amendment FERC's
jurisdiction has not changed and, thus, FERC does not have
exclusive jurisdiction over state-law contract matters that
relate to termination payments. EPMI explains that "FERC
currently possesses concurrent jurisdiction over these matters
that it rarely exercises" and argues that if Congress had
intended to alter the current jurisdictional scheme so
dramatically as to grant FERC exclusive jurisdiction over state-
law contract matters, in addition to its clear exclusive
jurisdiction over the federal regulatory matters, it would have
done so more explicitly. EPMI Br. at 21.[12] EPMI argues that the
Cantwell Amendment did not alter FERC's jurisdiction under the
FPA because the plain language of the Cantwell Amendment merely
clarifies §§ 205 and 206 of the FPA, the legislative history
shows that Congress intended to affirm FERC's jurisdiction, and
construing the Cantwell Amendment as stripping the bankruptcy
courts' jurisdiction would violate principles of statutory
construction. Defendants argue that FERC properly has

---

[12] "EPMI Br." refers to Enron Power Marketing, Inc.'s Opening
Brief dated January 31, 2006.

jurisdiction over state-law contract claims that relate to termination payments and the Cantwell Amendment does not alter the jurisdictional balance because FERC already had concurrent jurisdiction over the federal regulatory and state-law contract claims.

    1. <u>Plain Language</u>

EPMI argues that the plain language of the Cantwell Amendment under section (b) for "Relief" makes clear that this is a clarifying statute, while Defendants and the Government argue that the plain language shows that Congress intended to grant FERC exclusive jurisdiction on the FPA issues <u>and</u> on the state-law matters.   The relevant portion of the Cantwell Amendment states:

> the Commission shall have exclusive jurisdiction under the Federal Power Act . . . to determine whether a requirement to make termination payments for power not delivered by the seller . . . is not permitted under a rate schedule (or contract under such a schedule) or is <u>otherwise</u> <u>unlawful</u> on the grounds that the contract is unjust and unreasonable or contrary to the public interest.

119 Stat. at 983-84 (emphases added).

The Supreme Court has explained that the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.  Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is

coherent and consistent.'" <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340 (1997) (citations omitted).  "[W]here the meaning of a statute's terms are unambiguous, the plain meaning of the statute controls its interpretation.  However, where statutory language is ambiguous a court may resort to the canons of statutory interpretation and to the statute's legislative history to resolve the ambiguity." <u>Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG</u>, 335 F.3d 52, 57 (2d Cir. 2003).  EPMI argues that the word "otherwise" in this excerpt would be meaningless if the Amendment were anything but clarifying because it is used here to "relat[e] both 'unlawful' and 'not permitted' to 'unjust, unreasonable, and contrary to the public interest.'" Tr. 49:6-49:8.[13]  EPMI continues:

> The way to prove that [otherwise is a relator] is to make believe the word "otherwise" isn't there.  If we crossed it out, then . . . you would have two independent clauses joined by an "or," and you would have one test that says it is not permitted and another test that says unjust, unreasonable, and contrary to the public interest.
>
> . . . The only way to give the word "otherwise" meaning--and we know that every word in a statute should be given meaning if we can give it meaning--is to say that "otherwise not permitted under a rate schedule" means not permitted because it is unlawful on the grounds that the contract is unjust, unreasonable, or contrary to the public interest.
>
> . . . FERC itself said that we read ["not permitted under a rate schedule"] to mean the state contract law

---

[13] "Tr." refers to the transcript of the oral arguments held on July 26, 2006.

> issues, and that is how Snohomish and the U.S. would
> like you to read it, that "not permitted under a rate
> schedule" means not permitted under applicable non-FPA
> law.  FERC has told us that is exactly what they don't
> do and that it has nothing to do with the FPA.

Tr. 49:9-49:23; 51:14-51:19 (explaining that FERC did not use

its classic FPA standard of review of "unjust, unreasonable, and

contrary to the public interest" in its June 28 Order involving

EPMI-Snohomish in which FERC determined--based on New York state

contract law--that EPMI should not collect termination

payments).  EPMI argues that the purpose of the statute was

"redundant, but it is a redundancy meant for clarification," Tr.

61:20-61:22, which Congress may do, see, e.g., United States v.

Mele, 117 F.3d 73, 75 (2d Cir. 1997).  Defendants and the

Government contend that "otherwise" must be read in conjunction

with "unlawful" to see that Congress is granting the additional

exclusive jurisdiction because "what comes before 'otherwise

unlawful' is what FERC has exclusive jurisdiction over

[including state-law matters] and what comes after it is the

reference to FERC's usual unjust, unreasonable, or contrary to

the public interest standard." Tr. 56:16-56:19; 57:4-57:6.  The

Government argues that its interpretation that "the Commission

shall have exclusive jurisdiction under the Federal Power Act to

determine whether a requirement to make termination payments for

power not delivered by the seller . . . is not permitted under a

rate schedule" grants exclusive jurisdiction over all matters

involving termination payments (that is, over the state-law contract claims and the claims under the rate schedule) is a more logical interpretation because EPMI's interpretation "renders the entire Amendment as mere surplusage." Gov't Br. at 20.[14]

I find that the language and syntax of the statute clearly and unambiguously tie the relief FERC is authorized to grant to its traditional considerations under the FPA.  Because the single sentence is written with the disjunctive "or," FERC's traditional test of whether the provision at issue is "unjust, unreasonable or contrary to the public interest" applies to both "not permitted under a rate schedule (or contract under such rate schedule" and "otherwise unlawful."  If that were not the case, the word "otherwise" would be superfluous.  This statutory language is also consistent with the phrasing of prior FERC jurisdictional statutes, e.g.,

> Whenever the Commission . . . shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

---

[14] "Gov't Br." refers to the Government's brief pursuant to 28 U.S.C. § 2403 and Fed. R. Civ. Proced. 24 dated July 7, 2006.

16 U.S.C. § 824e, solely in terms of FERC's power to modify or
invalidate contract provisions.  It does not state that FERC has
exclusive jurisdiction over "contract claims for termination
payments" or to "construe or enforce" contract provisions for
termination payments.

General administrative law considerations also support this
reading of the statutory language.  The Supreme Court has
instructed that "when Congress confers decisionmaking authority
upon agencies[,] Congress must 'lay down by legislative act an
intelligible principle to which the person or body authorized to
[act] is directed to conform.'" Whitman v. Am. Trucking Ass'n,
Inc., 531 U.S. 457, 472 (2001) (citation omitted) (emphasis in
original).  The Supreme Court explained that Congress must
create an "intelligible principle" to guide the agency to act,
and the agency cannot cure an unlawful delegation by creating
its own standard. Id.  If § 1290(b) was to give FERC exclusive
jurisdiction to resolve state-law contract claims, Congress
would have been required to specify some state law or other non-
EPA standard for FERC to apply.  It did not do so but instead
tied the "not permitted under a rate schedule (or contract under
such a schedule)" to the recognized "unjust, unreasonable or
contrary to the public interest" standard by using the word
"otherwise."

The Government argues that this interpretation would render the Cantwell Amendment as mere "surplusage." Clarifying statutes, however, are permitted, <u>e.g.</u>, <u>Mele</u>, 117 F.3d at 75, and, as set out in the consideration of legislative history below, there is substantial support for a Congressional intent to clarify and confirm FERC's traditional jurisdiction. Thus, I find that the plain language of the Cantwell Amendment, particularly when read in conjunction with its legislative history, supports EPMI's reading of the statute.

2. <u>Legislative History</u>

In situations where the plain language of the statute is ambiguous, the Court of Appeals has instructed that courts may investigate legislative history to help in resolving such ambiguities. <u>See</u> <u>Canada Life</u>, 335 F.3d at 57. Because I have found the statutory language to be clear and unambiguous, that inquiry is not necessary here. As the Government noted, legislative history is vulnerable to misreading because it "is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become . . . an exercise in 'looking over a crowd and picking out your friends.'" Gov't Br. at 22. The following excerpts from the Congressional Record on the issue support the contention that each party can extract legislative history favorable to its side:

Ms. CANTWELL. I do not assume this position in denigration of the responsibility of the bankruptcy court. The bankruptcy court has an important role to play in our law and our economic community. However, I do think it is fair to say that it is a forum in which it naturally looks first to maximizing the assets of the estate. In contrast, the Federal Energy Regulatory Commission's first obligation is to protect our nation's ratepayers. In this very unique context, in which a seller of electricity that has fraudulently and criminally manipulated the market in violation of the tariffs on file with the commission--and where the seller is now seeking to reap the profits from that activity in the form of termination payments for power never delivered--what we are saying here, unequivocally, is that FERC is the forum in which this should be resolved. <u>FERC is the entity that is supposed to look after our nation's ratepayers, and should have make the decision about whether termination payments are permissible under the Federal Power Act.</u> . . .

<u>The intent of section 1270 of the underlying bill and the technical correction we have adopted today is simply to affirm that the Federal Energy Regulatory Commission has exclusive jurisdiction under sections 205 and 206 of the Federal Power Act to determine whether these termination payments should be required.</u> This provision expresses Congress's belief that the issues surrounding the potential requirement to make termination payments associated with wholesale power contracts are inseparable and inextricably linked to the commission's jurisdictional responsibilities.. . . .

This provision in no way prejudices or predetermines FERC's decisions in those matters. During the Senate Energy Committee's work on this legislation, the supporters of this amendment and I initially considered offering an amendment that would have gone further to require a certain outcome, had the commission made certain findings. We chose not to pursue that amendment in response to concerns that were raised by colleagues. <u>Section 1270 of this legislation is completely neutral regarding how the commission uses its authority under sections 205 and 206 of the Federal Power Act.</u> As such, the provision does not in any way implicate what is known as the

Mobile-Sierra doctrine, related to which standard FERC should apply to its review of jurisdictional wholesale power contracts.

Mr. CRAIG. How does the technical amendment adopted today further clarify the committee and Congress's intent in regard to section 1270 of the underlying legislation?

Ms. CANTWELL. The <u>clarifications to section 1270 effectuated by the amendment</u> accepted today are consistent with the committee's intent in adopting section 1270. In addition, they are completely consistent with Supreme Court precedent.

The committee sought assurances that section 1270 would not disturb underlying legal doctrines such as the Mobile-Sierra doctrine or the separation of powers principles. The amendment provides further clarity that section 1270 is not intended to otherwise disturb or modify the Mobile-Sierra doctrine by adding the phrase "or contrary to the public interest." This phrase, when coupled with the standard recital of FERC's exclusive authority to determine whether a charge is just and reasonable, makes it clear that Congress is making no pronouncements regarding the manner in which FERC exercises its authority, but rather only that it is the appropriate forum to resolve these issues. Congress is giving no guidance to FERC on Mobile-Sierra one way or another through this provision.

<u>The committee's overarching intent with respect to section 1270 was to ensure that the Federal Energy Regulatory Commission, and not the bankruptcy court involved in the Enron matter, decides all of the issues surrounding whether termination payments are lawful. The addition of the phrase "rate schedules and contracts entered thereunder" ensures that result.</u>

In addition, <u>this clarification</u> is completely consistent with Supreme Court decisions permitting Congress to give a Federal agency the authority to resolve matters that are also normally addressed by our judicial branch of government. As the Supreme Court stated in a case entitled <u>Commodity Futures Trading Commission v. Schor</u>, 478 U.S. 833, 854 (1986),

"looking beyond form to the substance of what Congress has done", we are persuaded that the congressional authorization of limited CFTC jurisdiction over a narrow class of common law claims as an incident to the CFTC's primary, and unchallenged, adjudicative function does not create a substantial threat to the separation of powers. <u>Thomas v. Union Carbide Agricultural Products Co.</u>, 473 U.S. 568, 589 (1985).

Similarly, in this instance, <u>the grant of authority to FERC to decide this matter is exceedingly narrow insofar as it relates solely to the legality of Enron collecting additional profits in the form of termination payments for power not delivered. Clearly, it is directly related to the agency's core function to ensure just and reasonable rates and guard against market manipulation.</u> Moreover, these are public rights that are at stake in this dispute--the rights of electric ratepayers across the country to just and reasonable rates, rights that have existed under federal statute since 1935--and not mere private rights that should be resolved by a non-article III bankruptcy tribunal. Accordingly, <u>the clarification provided by the amendment</u> is completely consistent with Supreme Court precedent on the separation of powers principle. . . .

I will tell my colleagues that there is no way under the sun that I believe my constituents owe Enron another penny. Not one single penny more. What this amendment does is ensure that, when the Federal Energy Regulatory Commission FERC comes to a conclusion later this year about how to cleanup the Enron mess, that the bankruptcy court cannot overturn FERC's decision about whether these "termination payments" are just, reasonable or in the public interest. It says to FERC, "do your job to protect consumers, and when you make a decision, that decision will stand." <u>Interpreting our nation's energy consumer protection laws is not the job of a bankruptcy judge.</u>

Now, this Senator has a very strong opinion on this matter in general. I believe there is no way no stretch of the imagination, or interpretation of law in which these termination payments could be deemed just, reasonable or in the public interest, knowing everything we know today about what Enron did to the

consumers of my state. In fact, during committee debate on the underlying provision in this bill, some of my colleagues suggested that we should just out-right abrogate these contracts; simply declare them null and void on their face. But what we recognized, relying on the legal expertise of the committee staff, is that an act like that--as tempting as it may seem--would pose certain constitutional issues. We recognized that this provision section 1270--is the best way for Congress to express its will in this matter. . . .

Section 1270 states that notwithstanding any other provision of law, and specifically the bankruptcy code, FERC "shall have exclusive jurisdiction" to make these determinations. <u>Many of my colleagues might naturally assume that this provision merely sets forth what is already the case. But as I stated earlier, that is not necessarily the case. This provision is necessary and critical because the Federal bankruptcy court has already concluded that it will not defer to FERC with respect to whether our constituents will be required to make termination payments.</u> Not only has the bankruptcy court not deferred to FERC, it compounded the seriousness of the issue by enjoining FERC from proceeding with its own specific inquiry into whether Enron is owed the termination payments. It forced FERC to stop on a matter that FERC had said required its special expertise. . . .

Mr. ENSIGN. Despite the ruling of a FERC administrative law judge that FERC's expertise was necessary to interpret the master tariff's requirement that a terminating party act "reasonably," the bankruptcy court has enjoined FERC from further considering this issue. Section 1270 of this legislation confirms the decision of the FERC administrative law judge. This section says the judge is correct and the bankruptcy court is wrong. <u>It makes clear that, in this limited matter, FERC has the exclusive jurisdiction to determine the merits of the claims at issue.</u>

151 Cong. Rec. S 7267, 7269, 7271, 7273 (June 23, 2005) (section 1270 was later amended to be section 1290) (emphases added).

Aspects of the legislative history can be used to support each side's arguments.  For example, Senator Cantwell repeatedly refers to the Amendment as a "clarification" and a "technical correction" to existing legislation and refers to the Amendment as involving FERC's "narrow" . . . "grant of authority."  Further, the Senator states that this Amendment relates to FERC's power "under the Federal Power Act," that is, its traditional power, not the power to determine state-law contract claims.  On the other hand, Senator Cantwell also describes the intent of the legislation as having FERC, "and not the bankruptcy court involved in the Enron matter, decide[] all of the issues surrounding whether termination payments are lawful.  The addition of the phrase 'rate schedules and contracts entered thereunder' ensures that result."  Further, the Senator states, "Interpreting our nation's energy consumer protection laws is not the job of a bankruptcy judge."  In addition, Senator John Ensign of Nevada explained that the legislation "makes clear that, in this limited matter, FERC has the exclusive jurisdiction to determine the merits of the claims at issue."  I find that the legislative history is ambiguous as to Congress' intent but, as noted, does include substantial support for interpreting the statute as clarifying FERC's traditional jurisdiction.

3. <u>Statutory Construction</u>

In considering statutory construction, courts are cautioned that:  first, Congress likely would show an intent to change a longstanding practice, second, Congress must show a clear intent to alter the balance of state-federal power, and third, courts should avoid construing legislation in a manner that would raise grave constitutional questions when an equally plausible explanation exists that does not raise those issues.

First, in situations where Congress legislates to modify significantly longstanding practices, courts should look for an intent on Congress' part to do so. "Congress is unlikely to intend any radical departures from past practice without making a point of saying so." <u>Jones v. United States</u>, 526 U.S. 227, 234 (1999).  Further, "A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." <u>Green v. Bock Laundry Mach.</u> <u>Co.</u>, 490 U.S. 504, 521 (1989).

Second, beyond showing an intent to modify a longstanding practice, Congress must evidence a clear intent to alter the balance of state-federal power and strip state courts of the power to apply their own states' laws.  "Just as the conventions of expression indicate that Congress is unlikely to alter a statute's obvious scope and division of authority through muffled hints, the background principles of our federal system

also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States' police power." <u>Gonzales v. Oregon</u>, 126 S. Ct. 904, 925 (2006); <u>United States v. Bass</u>, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.").

Third, "[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." <u>Jones v. United States</u>, 526 U.S. 227, 239 (1999) (quoting <u>United States ex rel. Attorney Gen. v. Del. & Hudson Co.</u>, 213 U.S. 366, 408 (1909)).

Here, there is no clear evidence that Congress has intended to modify a long-standing practice or to alter the balance of state-federal power.  In addition, EPMI raises several grave constitutional questions that could arise by interpreting the Cantwell Amendment in the way that Defendants and the Government suggest, that is, as granting FERC exclusive jurisdiction over the state-law claims for termination payments.  Among the many potential constitutional concerns if the Cantwell Amendment were to grant FERC exclusive jurisdiction over the state-law claims are, for example, violations of the Bankruptcy Clause and the principle of separation of powers.

a. Bankruptcy Clause

First, there may be a violation of the Bankruptcy Clause because the legislation appears to be directed only to one entity--Enron. The Constitution grants Congress the power to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4. The Supreme Court has explained: "The uniformity requirement . . . prohibits Congress from enacting a bankruptcy law that, by definition, applies only to one regional debtor." Ry. Labor Executives' Ass'n v. Gibbons, 455 U.S. 457, 473 (1982) (or to "one named debtor," id. at 471). To assess whether a statute violates bankruptcy uniformity, (1) I must determine if the statute is bankruptcy-clause litigation; (2) if it is, I must ask whether the statute applies "uniformly to a defined class of debtors." Id. at 465, 473.

As to whether this matter involves bankruptcy law, I must focus on the subject of the legislation. The Supreme Court has described bankruptcy as: "of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief." Id. at 466. If the Cantwell Amendment were read as Defendants suggest it should be read, it could modify bankruptcy jurisdiction by re-delegating from the bankruptcy court to FERC state-law issues that directly affect

the estate and, thus, debtor-creditor relations.[15]  Thus, the Cantwell Amendment easily could be viewed as bankruptcy law.

If the Cantwell Amendment is bankruptcy law, it is difficult to understand how this law was enacted for anyone except Enron.  The legislation specifically describes a situation that only Enron fits.  Tr. 84:7-84:9.  Further, the legislative history shows how Senator Cantwell repeatedly referred to "Enron" and punishing Enron for the manner in which its actions affected her constituents.  Some excerpts of these references to punishing Enron follow:

> Ms. CANTWELL. Mr. President, I wish to clarify for my colleagues the intent of section 1270 of the underlying Energy bill, which is a provision of extreme importance to my Washington State

---

[15] To the extent that Defendants suggest that EPMI argued that the Cantwell Amendment was "non-bankruptcy federal law," Rabinowitz Decl., Ex. 15., in support of its position that the reference to the bankruptcy court should be withdrawn to permit an Article III court to determine its constitutionality, and thus that EPMI is judicially estopped from arguing now that the Cantwell Amendment is bankruptcy law, I reject that argument. First, EPMI's argument is that, properly construed, the Cantwell Amendment is not bankruptcy law but is a clarification of FERC's traditional jurisdiction in the face of, it says, unfounded Congressional concerns that the bankruptcy court would appropriate FERC's traditional powers to determine whether rates, charges and the like were "just, reasonable and in the public interest."  Second, the bankruptcy judge presiding over the Enron case, Hon. Arthur J. Gonzalez, has observed in a related trading case that "EPMI has always been straightforward concerning its recognition that the energy transactions involved here are subject to oversight by FERC and that pursuant to the governmental unit exemption from the automatic stay proved by section 362(b)(4), the parties remain subject to FERC's police and regulatory power." Comet Decl., Ex. X, bankruptcy court proceeding, No. 01-16034, at 17 (Dec. 2, 2004).

constituents. Ratepayers in my State were harmed by the Western energy crisis and the manipulation and fraudulent practices of Enron in wholesale electricity markets. A number of proceedings remain underway at the Federal Energy Regulatory Commission, which will determine the relief granted to consumers harmed by Enron's unlawful trading practices. An important issue that remains is whether utilities--such as Washington State's Snohomish County Public Utility District-- should be forced to make termination payments to Enron, for power Enron never delivered in the midst of its scandalous collapse into bankruptcy. . . .

As my colleagues appreciate by now, my State was particularly ravaged by the western energy crisis of 2000-2001. One of my State's public utility districts, Public Utility District No. 1 of Snohomish County, had a long-term contract with Enron, to purchase power. The contract was terminated once Enron began its scandalous collapse into bankruptcy. Nonetheless, Enron has asserted before the bankruptcy court the right to collect all of the profits it would have made under the contract through so-called "termination payments." Enron has made this claim even though Enron never delivered the power under the contract, even though Enron had obtained its authority to sell power fraudulently, and even though Enron was in gross violation of its legal authority to sell power at the very time the contract was entered into. This has been demonstrated by the criminal guilty pleas of the senior managers of Enron's Western power trading operation, in which it has been admitted that Enron was engaged in a massive criminal conspiracy to rig electric markets and rip off electric ratepayers. But it has been further illustrated by the now-infamous Enron tapes, in which Enron employees discuss many unsavory topics, including specifically how they were "weaving lies together" in their negotiations related to the contract with Snohomish.

I will tell my colleagues that there is no way under the sun that I believe my constituents owe Enron another penny. Not one single penny more. What this amendment does is ensure that, when the Federal Energy Regulatory Commission FERC comes to a conclusion later this year about how to cleanup the Enron mess, that the bankruptcy court cannot overturn FERC's decision

about whether these "termination payments" are just, reasonable or in the public interest. It says to FERC, "do your job to protect consumers, and when you make a decision, that decision will stand." Interpreting our nation's energy consumer protection laws is not the job of a bankruptcy judge. . . .

Given the nuanced, legal nature of this provision, <u>I can assure my colleagues that this "rifle shot</u>," as the ranking minority member of the committee called it, <u>is narrowly drawn</u> in order to minimize any unanticipated impacts. <u>It is only applicable to contracts entered into during the electricity crisis with sellers of electricity that manipulated the market to such an extent that they brought about unjust and unreasonable rates. There is only one such seller, and that is Enron</u>, and there are only a handful of terminated contracts with Enron that haven't been resolved as of this date.

As a result, the amendment does not tamper with or otherwise disturb long-standing legal precedents. It does not tamper with the Mobile-Sierra doctrine, nor does it disturb other recent federal court decisions regarding the relationship of the bankruptcy courts and FERC in the context of the rejection in bankruptcy of FERC approved power sales contracts. It is, as the ranking minority member of the committee observed, a "clean shot" that "affirms that FERC is the entity with the authority to review whether termination payments associated with cancelled Enron power contracts are lawful under the Federal Power Act."

151 Cong. Rec. S 7269-71 (emphases added). The Government explained during oral argument that it was "not aware of anyone else" that this legislation could have applied to, even though, it explains, that is irrelevant because the statute was drafted in general terms (that is, it did not single out Enron by name). Even so, this legislation raises grave constitutional questions concerning the Bankruptcy Clause by appearing to single out one

entity in the legislation and in the legislative history of the legislation and adjusting the relations between that insolvent entity and its creditors.

    b. Separation of Powers

    Second, reading the Cantwell Amendment as granting exclusive jurisdiction to FERC over state-law contract claims relating to termination payments might constitute a separation-of-powers violation because the effect would be the transfer of power from state courts and Article III courts--as bankruptcy courts take their power by reference from Article III courts--to FERC, which is an Article I agency.  Article III is "'an inseparable element of the constitutional system of checks and balances,'" that "protect[s] 'the role of the independent judiciary within the constitutional scheme of tripartite government,' and . . . safeguard[s] litigants' 'right to have claims decided before judges who are free from potential domination by other branches of government.'" Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 848, 850 (1986) (citations omitted).  Congress' attempt to control resolution of EPMI's contractual disputes by giving FERC jurisdiction over private, state-law disputes works the precise evil Article III and the separation-of-powers doctrine are designed to prevent: allowing the legislative branch to exercise coercive influence on a decisionmaker's resolution of private claims.  Indeed,

there is reason to believe that such coercive influence was
exerted here.  FERC Commissioner Nora Mead Brownell voted
"present" rather than participate in the June 28 Order of the
EPMI-Snohomish proceeding. <u>Snohomish County</u>, 115 FERC ¶ 61,375,
No. EL05-139-000, 2006 WL 1757334.  In explaining that vote,
Commissioner Brownell wrote:

> The adjudicatory proceedings that Snohomish has
> pending before the Commission have been the subject of
> continuous statements, letters and press releases from
> non-parties regarding what is the appropriate outcome,
> questioning the competency and fairness of the
> decision-makers, and criticizing the rules of
> procedure that govern every adjudicatory proceeding.
> The Commission's order on the Enron-Trial Staff
> Settlement itself, issued concurrently, recognizes
> that the external influence on the decisional
> processes of the Commission remains unabated. I am
> concerned whether we can truly discount what has been
> said.
>
> The inordinate amount of intrusion and the direct
> focus on a particular outcome in this matter have now
> reached the point where I believe the most appropriate
> course of action for me is to simply vote "present."

<u>Id.</u> (citation omitted).

To assess the "extent to which a given congressional
decision to authorize the adjudication of Article III business
in a non-Article III tribunal impermissibly threatens the
institutional integrity of the Judicial Branch," the Supreme
Court has announced a number of non-determinative factors that
courts should weigh:

> [1] the extent to which the "essential attributes of
> judicial power" are reserved to Article III courts,

> and, conversely, the extent to which the non-Article
> III forum exercises the range of jurisdiction and
> powers normally vested only in Article III courts
> [2] the origins and importance of the right to be
> adjudicated, and
> [3] the concerns that drove Congress to depart from
> the requirements of Article III.

CFTC, 478 U.S. at 851.

The first factor, the extent to which the "essential attributes of judicial power" are reserved to Article III courts and the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, raises a problem if Congress intended to grant state-law contract jurisdiction exclusively to FERC, a federal agency. Private contract disputes clearly are not the expertise of FERC, as FERC had acknowledged prior to its June 28 Order by generally declining to decide these matters, and are the bread and butter of state courts. In fact, even in FERC's June 28 Order, it stated, "The Commission would not typically rule on the contract issues raised by Enron's termination payment claim, or by Snohomish's petition, in which affirmative defenses relating to this claim are raised . . . . These claims and defenses require for their resolution, the application of state law and do not otherwise require uniform interpretation with respect to the policies we are required to administer." Snohomish County, 115 FERC ¶ 61,375, No. EL05-139-000, 2006 WL 1757334 ¶ 2. Similarly, in another FERC decision on June 28,

2006, dismissing a petition, FERC stated that it "possesses no
special expertise over the contractual issues raised by Vernon's
petition, including Vernon's allegations regarding Mirant's
insolvency, creditworthiness, and alleged fraud in inducing
Vernon to enter into the Agreement.  These issues, rather, turn
on standard contract and/or tort principles and do not address
matters arising under the FPA." City of Vernon, 115 FERC
¶ 61,374, No. EL06-3-000 ¶ 41.  Further, courts are able to
handle jury trials, while FERC cannot.  Nonetheless, as the
Government pointed out, the contract disputes at issue here
regarding termination payments in long-term power contracts are
only disputes that are "inextricably intertwined" with FERC's
regulatory function. Gov't Br. at 27.  Also, as EPMI knew, FERC
had concurrent jurisdiction over these disputes even prior to
the Cantwell Amendment. Gov't Br. at 28-29.  Nevertheless,
because these contract claims traditionally have been resolved
by jury trial in state courts or Article III courts, this factor
raises a separation-of-powers issue.

     The second factor, the origins and importance of the right
to be adjudicated, may raise issues similar to those discussed
under the first factor, that is, that private rights are the
bailiwick of Article III and state courts, as is the right to
trial by jury under certain circumstances.  The origin of the
right to be adjudicated here may be regarded as the prior

practice of matters that FERC handled versus those matters that the bankruptcy court handled.  Prior to the Cantwell Amendment, on one hand, generally FERC handled public rights disputes-- rights that involved the government and others;[16] here, those were rights that implicated the FPA and regulations thereunder and were subject to the "unjust and unreasonable" standard.  On the other hand, the bankruptcy court, by referral of an Article III court, handled private rights disputes--rights that involved liability of one individual to another under the law; here, those were rights that, for example, dealt with state contract law disputes.  This matter appears to involve both "public" and "private" rights and cannot be entirely placed into one category.  Yet, reading the Cantwell Amendment as abruptly shifting construction and enforcement of some of these traditionally private rights from the bankruptcy court to FERC, an Article I agency, raises a separation-of-powers issue under this factor, as well.

The third factor, the concerns that drove Congress to depart from the requirements of Article III, should have a purpose that is benefited by a federal regulatory scheme, "not

---

[16] The Supreme Court generally described these terms and explained the public-private rights dispute in a plurality opinion. N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 67 & n.18, 69, 70 (1982) (plurality).  In Northern Pipeline, the Court explained that only public-right disputes could be removed from Article III courts and delegated to administrative agencies and the like. Id. at 70.

on allocating jurisdiction among federal tribunals." <u>CFTC</u>, 478
U.S. at 855 (upholding legislation that created "an inexpensive
and expeditious alternative forum" for customers by placing all
litigation in one place).  Here, if Congress intended to grant
exclusive jurisdiction of these state-law claims to FERC, the
purpose may not have been proper, as reflected in the
legislative history.  For example, Senator Cantwell explained:

> The bankruptcy court has an important role to play in
> our law and our economic community. However, I do
> think it is fair to say that it is a forum in which it
> naturally looks first to maximizing the assets of the
> estate. In contrast, the Federal Energy Regulatory
> Commission's first obligation is to protect our
> nation's ratepayers. In this very unique context, in
> which a seller of electricity that has fraudulently
> and criminally manipulated the market in violation of
> the tariffs on file with the commission--and where the
> seller is now seeking to reap the profits from that
> activity in the form of termination payments for power
> never delivered--what we are saying here,
> unequivocally, is that FERC is the forum in which this
> should be resolved. . . .
>
> I will tell my colleagues that there is no way under
> the sun that I believe my constituents owe Enron
> another penny. Not one single penny more. What this
> amendment does is ensure that, when the Federal Energy
> Regulatory Commission FERC comes to a conclusion later
> this year about how to cleanup the Enron mess, that
> the bankruptcy court cannot overturn FERC's decision
> about whether these "termination payments" are just,
> reasonable or in the public interest. It says to FERC,
> "do your job to protect consumers, and when you make a
> decision, that decision will stand." Interpreting our
> nation's energy consumer protection laws is not the
> job of a bankruptcy judge.

151 Cong. Rec. S 7267, 7270-71.  These comments by Senator
Cantwell are troubling in that they show a potentially improper

reason to depart from the requirements of Article III, that is, an intention to ensure that EPMI's state-law contract claims for termination payments are defeated.  Thus, this factor also raises a separation-of-powers issue.

To avoid these two, and possibly other, potential grave constitutional questions, I find the equally (indeed, more) plausible explanation--that the Cantwell Amendment is a clarifying statute--to be consistent with Congress' intention in passing this legislation.

<u>CONCLUSION</u>

For the reasons set out above, Defendants' cross-motions to dismiss or stay the adversary proceedings (docket no. 18) and Defendant Luzenac's motion to transfer the action to FERC are denied.  EPMI's motions for a determination of the continuing jurisdiction of the bankruptcy court, as opposed to FERC, over this adversary proceeding in light of the enactment of the Cantwell Amendment are granted.

Because EPMI's motions to withdraw the reference to the bankruptcy court were for the limited purpose of construing the Cantwell Amendment and, thus, determining the continuing jurisdiction of the bankruptcy court on this issue and I have determined that jurisdiction over the state-law contract issues lies with the bankruptcy court, this Order resolves the two above-captioned withdrawals of the adversary proceedings for a

special purpose.  Accordingly, the Clerk of the Court shall mark

those withdrawals closed and all pending motions denied as moot.

SO ORDERED
August 31, 2006

Loretta A. Preska, U.S.D.J.